UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARISBEL GUSMAN,

                              Plaintiff,

        -against-

THE CITY OF NEW YORK; NEW YORK
CITY DEPARTMENT OF CORRECTION
("DOC"); NEW YORK CITY POLICE
DEPARTMENT ("NYPD"); BRONX
COUNTY DISTRICT ATTORNEY'S
OFFICE, C.O. INVESTIGATOR PATRICIA
DOCKERY, DOC/IU SHIELD #559; C.O.
CRISTINA BREWLEY, DOC SHIELD #9949;
C.O. JACK, DOC SHIELD #U/K; C.O. JANE
DOE, DOC SHIELD #U/K; POLICE
OFFICERS JOHN DOE 1-4, SHIELD #U/K,

                              Defendants.

**COMPLAINT
WITH JURY DEMAND**

        Plaintiff, by and through her attorneys, the Law Offices of Goldman & Associates, for

her Complaint alleges as follows:

<u>**NATURE OF THE ACTION**</u>

        1.        Arisbel Gusman was only 20 years old when her life changed

dramatically. Up until the day that virtually her entire immediate family was arrested, she was a

college student with a part-time job who lived in a loving home with her parents and two

siblings. After her parents were separately jailed and indicted, she suddenly found herself the

primary caretaker of her ten-year old brother and the new breadwinner for the family. Ms.

Gusman was forced to drop out of school and find full-time employment in order to hold her

family together through a traumatic and difficult time.  She found a job earning $15 an hour and did her best to care for her little brother by making sure he was eating and going to school, and comforting him in their parents' absence.

2.      Twice a week after work, Ms. Gusman would make the long trek out to Rikers Island to visit her parents.  Her father was an inmate at North Infirmary Command (NIC), while her mother was incarcerated at Rose M. Singer. Because of Rikers' isolated location, sprawling size, and extensive visitor security measures, each visit could take five hours or more; nevertheless, Ms Gusman dutifully made the trip twice a week, often taking one of her siblings with her.

3.      On January 3, 2019, Ms. Gusman stopped at a local newsstand before heading out to Rikers, accompanied by her 10 year-old brother, R.P. Her parents had asked her to bring them a few magazines to help them pass the time. After picking up the periodicals, she and her brother drove in her car to the bridge leading out to Rikers Island. There they boarded a Department of Correction bus that would take them to the Rikers Island Visit Control Building, the first step in the security gauntlet they would have to navigate before they could see their parents.

4.      After putting their belongings in a locker provided for that purpose, Ms. Gusman took the magazines she had purchased for her father, and she and her brother passed through a security check and a magnetometer before getting on yet another bus, this one bound for NIC.

5.      After waiting a long time at NIC, they were eventually told that there was a delay, and that it was unclear when, or even whether, they would be able to see their father. Knowing that their visiting time was limited, they elected to return to the Visit Control Building

so they could attempt to visit their mother. While such delays are not unusual at Correctional facilities in New York, what happened next surely was. Instead of being allowed to visit her mom, Ms. Gusman found herself under arrest and detained in a cell, accused of promoting prison contraband. The contraband? The perfectly legal magazines she had purchased earlier that day from a Queens newsstand.

6.     It began when Ms. Gusman set off the metal detector at the visiting center, presumably because of the metal underwire in her bra. After filling out a "Stop and Frisk form," she was separated from her brother and led to a small adjoining room. When she got there, the guards' interest was not focused on whatever metal she may or may not have had on her person, but on the magazines she had brought with her.

7.     New York had experienced torrential rainfall a few days earlier, on New Year's Eve. The magazines Ms. Gusman had purchased for her parents, sold to her off an outdoor newsstand, had gotten a bit wet. The corrections officers assigned to frisk Ms. Gusman decided that this water damage was evidence of tampering, and made the decision to examine the magazines further at an unknown location. Ms. Gusman was detained for an hour in the "stop and frisk room," unable to visit her parents or attend to her 10-year-old little brother, who had been left unsupervised in the Visitor Center while she awaited their decision.

8.     When the officer with the magazines returned, Ms. Gusman was ordered to stand and put her hands behind her back. She did as she was told, crying as she was handcuffed and placed in a cell, where she would remain for several hours. When she inquired about her 10-year-old brother, she was mocked and threatened with a call to the Administration for Children's Services. Her pleas of innocence were ignored or met with derision.

9.     Hours later, she was turned over to the custody of the NYPD and brought to Bronx Criminal Court for arraignment. After approximately 28 hours in custody, she was brought before a judge and informed that she was being charged with two felonies and several misdemeanors. Claiming that tests conducted at Rikers Island had shown that the magazines contained "synthetic marijuana," the Bronx District Attorney's office requested $25,000 bail. Though her counsel asked that she be released on her own recognizance, the court set bail at $15,000. Literally screaming in anguish when bail was set, Ms. Gusman was led handcuffed into the back so she could be transported to Rikers Island, this time as an inmate.

10.    Luckily, Ms. Gusman's family was able to raise the bail required to secure her release, but she remained in a cell, scared and distraught, for another two and a half hours until she was finally set free at approximately 4 A.M. on January 5, roughly 32 hours after she had been detained.

11.    Of course, her ordeal was not over yet. She was due back in court five days later, left to wonder who would take care her of her little brother if she, too, were to be incarcerated.  She knew she faced up to seven years in state prison if convicted.  Although she was free on bail, her anxiety and trauma stayed with her constantly, making it difficult for her to sleep or focus on her various responsibilities.

12.    On January 9, 2019, the prosecution indicated that there had been no grand jury action, and requested that the case be adjourned for that purpose. On the same date, the NYPD Police Laboratory Controlled Substance Analysis Section confirmed what Ms. Gusman had been saying all along: that the magazines she had brought to Rikers for her parents, the magazines that precipitated this ugly ordeal, contained "no visible residue." The conclusion of the report was "No Controlled Substance Identified."  Contrary to what the correction officers at

Rikers believed and a preliminary test allegedly confirmed, the magazines had not been infused with "synthetic marijuana" or otherwise tampered with.  In short, they were not contraband. They had simply gotten wet, just as Ms. Gusman had told them from the beginning.  Ms. Gusman was put through hell because the magazines she had purchased and brought to Rikers Island for her parents had gotten a little rainwater on them.

13.     Yet even this report was not the end of Ms. Gusman's ordeal. The District Attorney's office continued Ms. Gusman's prosecution for another 16 days before finally moving to dismiss the baseless charges against her on January 16, 2019.

14.     Despite the finding that the magazines contained no controlled substance, the Department of Corrections issued Ms. Gusman a "Notice of Limitation of Visiting Privileges" specifying that she was banned from contact with either of her parents from January 3, 2019 until July 2, 2019, a period of six months. A family already struggling to stay together during a difficult time was pushed even further apart despite the demonstrably false allegations. Even after the charges against Ms. Gusman were dismissed, these restrictions remained in place until counsel intervened in mid-February.

15.     While the Department of Corrections obviously has a strong security interest in preventing contraband from entering its facilities, that interest is not served by the arbitrary detention and arrest of family members entering a jail with nothing more pernicious than (formerly) wet magazines. What happened to Ms. Gusman was a failure of the system at every level, the blunt force trauma of a poorly run apparatus brought to bear on a young woman who sought nothing more than to visit her parents and bring them some modicum of comfort while they awaited trial. Despite following all the rules, she nonetheless found herself detained for 32 hours, the victim of faulty procedures, shoddy testing, and a reckless disregard for her

personal liberty. She brings this suit asking for just compensation for the indignities visited upon her, and in the hope that lessons from her experience will prevent such horrors from being inflicted on anyone else.

## PARTIES

16.     Plaintiff Arisbel Gusman is a 21-year-old citizen of the United States and was, at all relevant times, a resident of Queens, New York.

17.     Defendant City of New York ("City") is a municipal corporation duly organized under the laws of the State of New York. At all times relevant hereto, the City, acting through the New York City Police Department ("NYPD"), New York City Department of Correction ("DOC"), and the Bronx County District Attorney's Office, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD, DOC, and Bronx County District Attorney's Office matters and was responsible for the appointment, training, supervision, and conduct of all NYPD, DOC, and Bronx County District Attorney's Office personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD, DOC, and Bronx County District Attorney's Office, and for ensuring that NYPD, DOC, and Bronx County District Attorney's Office personnel obey the laws of the United States and of the State of New York.

18.     Defendant New York City Police Department ("NYPD"), officially the City of New York Police Department, is the primary law enforcement and investigation agency for the City of New York.

19.     Defendant New York City Department of Correction ("DOC") is the branch of the municipal government of New York City responsible for the custody, control and

care of New York's imprisoned population, housing the majority of them on Rikers Island, which it administers.

20.     Defendant Bronx County District Attorney's Office houses the elected district attorney for Bronx County, which is coterminous with the Borough of the Bronx, in New York City, and is responsible for the prosecution of violations of New York State laws. The office's jurisdiction includes offenses committed on Rikers Island.

21.     The following Defendants are officers, employees and/or agents of the City of New York.  At all relevant times, each of them was acting within the scope of his or her employment as an employee, servant and/or agent of the City.  At all relevant times, each of them was acting under color of state law.  Each of them is sued in his or her individual capacity:

    a.    Corrections Officer Investigator Patricia Dockery, DOC/IU Shield #559. At all times relevant hereto, C.O. Dockery was a corrections officer of the DOC, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such;

    b.    Corrections Officer Cristina Brewley, DOC/IU Shield #9949. At all times relevant hereto, C.O. Brewley was a corrections officer of the DOC, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such;

    c.    Corrections Officer _____ Jack, DOC/IU Shield #Unknown. At all times relevant hereto, C.O. Jack was a corrections officer of the DOC, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such;

d.      Corrections Officer Jane Doe. At all times relevant hereto, defendant Jane Doe was a corrections officer of the DOC, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such (together with C.O.I. Dockery, C.O. Brewley, and C.O. Jack, the "Correction Officer Defendants").

e.      Police Officers John Doe 1-4. At all times relevant hereto, defendants John Doe 1-4 were police officers employed by and/or under the supervision of the NYPD, acting in the capacity of agent, servant, and employee of the City, and within the scope of her employment as such (collectively the "Police Officer Defendants").

## JURISDICTION AND VENUE

22.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, Article 1, Section 12 of the New York State Constitution, and New York State common law.

23.     This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(3) and (4), and 1367(a), because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. §1983, and seek redress of the deprivation, under color of state law, or rights guaranteed by the Constitution of the United States.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) and the doctrine of pendant jurisdiction.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants City of New York, City of New York Department of Correction, New York City Police Department, and the Bronx County District Attorney's Office reside in the judicial district, and, upon information and belief, many individual defendants reside in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

### JURY DEMAND

26.     Plaintiff demands trial by jury in this action.

### FACTUAL ALLEGATIONS

27.     In September 2018, Arisbel Gusman's mother, Arelis Peralta, and her stepfather, Ludwig Paz, a former NYPD detective, were incarcerated on Rikers Island, awaiting trial on a variety of criminal charges. While her parents were detained, Ms. Gusman remained in the family home at 221-80 91st Avenue in Queens Village, New York, with her sister, Jarielis, and her ten-year-old brother, R.P. Upon her parents' incarceration, Ms. Gusman became the primary caregiver for her little brother, and the primary source of income for her family. Accordingly, she dropped out of college and found a full-time job earning $15 an hour as a sales associate at the T-Mobile store located at 6033 Myrtle Avenue in Ridgewood, Queens. In addition to caring for her little brother, Ms. Gusman made the trip out to visit her parents on Rikers Island twice a week, often accompanied by one of her siblings.

28.     On the evening of January 3, 2019, Ms. Gusman left work and picked up her little brother, intending to visit her parents. Her parents had asked her to pick up some reading material for them, and Ms. Gusman headed to a local newsstand near the intersection of Myrtle and Wyckoff Avenues in Ridgewood, Queens, for that purpose. Her parents had requested specific titles – her mom wanted *People Magazine En Español* and *Women's Health*;

her father had asked for *GQ* and *Men's Health*. Unfortunately, quantities of the requested titles on the store's outdoor racks were very limited, and the remaining copies showed some residual water damage, likely the result of heavy rainfall a few days earlier on December 31st.[1] With no other options, Ms. Gusman opted to purchase the slightly water damaged copies, reasoning that they were still easily readable. She also purchased a newspaper for each of her parents.

29.    With the gifts for her parents secured, Ms. Gusman and her little brother got back in their car to begin their trip to Rikers Island. After arriving at the entrance to Rikers, they parked their car and boarded the Q100 bus to cross the Rikers Island Bridge.  On the other side of the bridge they exited the bus and entered the Rikers Visit Control Building, where all visitors to Rikers must pass through a security screening process.

30.    Ms. Gusman and R.P. headed to the locker area and put away their personal belongings, keeping only the magazines and newspaper intended for her father. Since her parents were housed in different facilities on Rikers, and since she would have to return to the Visit Control Building in between visits anyway, it made sense for her to take only what she needed for the first visit of the evening. She and R.P. passed through the metal detectors and security check without incident, and boarded the next corrections bus headed to North Infirmary Command (NIC), the jail where her father was housed.

31.    Ms. Gusman and her brother went through another metal detector and security screening at NIC, and waited to be permitted to visit with their father. Due to an unexplained delay, however, they were unable to see him. Realizing that the hour was running late, and that they only had a limited amount of time left to visit their mother, Ms. Gusman and

_____

[1] Weather Underground, New York City, NY Weather History, Dec. 31, 2018, https://www.wunderground.com/history/daily/us/ny/new-york-city/KLGA/date/2018-12-31.

her brother decided to leave the magazines they had bought for Mr. Paz with corrections staff, and head back to the Visitor Control Center, which they did.

32.     Upon arriving, they retrieved the magazines intended for their mother from the locker where they were stored and got on line for yet another trip through the metal detectors. Unlike the previous two times, however, Ms. Gusman's underwire bra set off the machines and Ms. Gusman was designated for a "pat frisk search." After filling out a "Pat Frisk form", Ms. Gusman was led to a small side room. R.P. was instructed to wait outside. Though neither of them knew it at the time, they would not see each other again for more than 32 hours.

33.     Ms. Gusman was joined in the pat frisk room by Correction Officers Brewley and Jack, who were pat frisking other visitors. Before Ms. Gusman was frisked, she was asked to give up the magazines. She agreed to do so. She gave her ID to C.O. Brewley, who told her that she didn't look her age. After ascertaining that Ms. Gusman had driven to the Island, Officer Brewley, who had never before met Ms. Gusman, bizarrely commented that she would not trust Ms. Gusman to drive her. Ms. Gusman had not extended such an offer, but this was the beginning of a pattern of disrespect that would continue throughout Ms. Gusman's time on Rikers Island.

34.     After a pat frisk revealed nothing untoward, Officer Brewley took the magazines, told Ms. Gusman that they looked like they had been tampered with, and said she would have to examine them. Officer Brewley then departed for an unspecified location with the magazines in her possession. Ms. Gusman was left in the pat frisk room with Officer Jack, while her 10-year-old brother, R. P., remained unattended elsewhere inside the Visitor Control Building. He would remain alone there for hours.

35.     An hour after she had left, Officer Brewley returned and ordered Ms. Gusman to stand up and put her hands behind her back. Without further explanation, Ms.Gusman was handcuffed and placed inside a holding cell. When Ms. Gusman asked why she was being handcuffed, Officer Brewley refused to answer. Her questions about her brother's whereabouts were similarly rebuffed. At this point it had been 90 minutes since she had last seen her ten-year-old brother, and Ms. Gusman was understandably worried for his safety. She received no assurances about his safety or well-being from Correction staff.

36.     Ms. Gusman remained in the holding cell for approximately three hours. She tried several times to ascertain why she was being held before she finally got an answer. Officer Jack asked her whether she was familiar with the drug K2. Ms. Gusman averred that she wasn't. Officer Jack told her that it was "synthetic marijuana" and that it had been found inside the magazines she had bought her parents. Ms. Gusman denied the allegations and told the officer that her parents were not drug users. It was at this point that Officer Brewley returned and asked, "your parents don't do drugs?" Ms. Gusman replied that they didn't, and that they weren't bad people. This was met by derisive laughter.

37.     Despite the officers' evident hostility, Ms. Gusman tried to explain to them that they were mistaken, reiterating that she had purchased the magazines in their present condition, specifying the location of the store, and volunteering that she might still have the receipt in her wallet. Neither officer made any move to investigate these claims. Instead, they insisted that the magazines had been saturated in K2, and they knew this because they had performed an unspecified test of the magazines.

38.     Locked in a cell for a crime she hadn't committed, terrified of what would happen next, and frantic with worry for her little brother, who she hadn't seen for hours, Ms.

Gusman again asked C.O. Brewley about R.P.'s location. Again, she was met with derision and hostility. C.O. Brewley said, "now's she's getting spicy, now we're going to ACS" [the Administration for Children's Services], an unmistakable threat to have her little brother removed from her custody and placed in the care of the State. With tears streaming down her face, Ms. Gusman told them that her sister was capable of watching over R.P, that she hadn't done what they'd accused her of, and that despite their legal troubles, her parents weren't drug users. Once again, they laughed at her.

39.    Eventually, Ms. Gusman was questioned by a pair of plainclothes police officers. A second pair of officers came and took Ms. Gusman from her cell, put her in handcuffs, and took her elsewhere on Rikers Island to be fingerprinted. From there, she was transported to Bronx Central Booking in anticipation of her arraignment. At no point did any of the correction officers or police officers involved update Ms. Gusman about the whereabouts of her little brother. It was only once she arrived at Central Booking that Ms. Gusman was able to ascertain that a family member had picked him up at Rikers.

40.    Based upon information and belief, the source of which is a conversation between attorney Peter A. Barta and a representative of the District Attorney's office, criminal defendants who are arrested on Rikers Island must have their cases written up by a special unit of the District Attorney's office located on the Island itself, and that complaint must then be delivered to Bronx Criminal Court via the next available correction bus making that trip. As a result of this process, Ms. Gusman was not arraigned within 24 hours, as generally required

under New York State Law,[2] but was instead arraigned more than 30 hours after she was initially detained.[3]

    41.    Ms. Gusman was arraigned in Bronx Criminal Court at approximately 1:15 AM on January 5, 2019 on Docket 2019BX000318. She was charged with three counts each of Criminal Possession of a Controlled Substance in the 5th Degree pursuant to P.L. §220.06(1), a D felony, Promoting Prison Contraband in the 1st Degree, pursuant to P.L. §205.25(1), also a D felony, Criminal Possession of a Controlled Substance in the 7th Degree, pursuant to P.L. §220.03, an A misdemeanor, and Promoting Prison Contraband in the 2nd Degree, pursuant to P.L. §205.20, also an A misdemeanor. The charges were based on the complaint of "CO Investigator" Patricia Dockery, who stated that she had been informed by Officer Brewley that Officer Brewley had, on January 3, 2019 at approximately 7:55 P.M., observed Ms. Gusman "to have in her custody and control, located within a visitor bucket, one (1) publication entitled People that was saturated with a liquid substance, and (1) publication entitled Women's Health that was saturated with a liquid substance." The complaint went on to indicate that C.O. Investigator Dockery was "an investigator for the New York City Department of Correction, who has training and experience in the recognition of controlled substances, marijuana, tobacco, and their packaging. Deponent further states that in addition to said training and experience, deponent did perform a preliminary screening test on the aforementioned liquid substance that saturated the above publications, and that based on the foregoing, said liquid substance is alleged and believed to be SYNTHETHIC MARIJUANA, a controlled substance." (emphasis in

---

[2] See People ex rel. Maxian on behalf of Roundtree v. Brown, 77 N.Y.2d 422 (1991).
[3] Ironically, the creation of the on-site District Attorney's office was intended to speed up the process of drafting and processing criminal complaints originating at Rikers Island. See Courtney Gross, Bronx DA Opens Office at Rikers Island, Spectrum New York 1 News, September 23, 2016, https://www.ny1.com/nyc/all-boroughs/criminal-justice/2016/09/22/bronx-da-opens-office-at-rikers-island.

original.) The complaint also contains an allegation that "SYNTHETIC MARIJUANA" is considered to be dangerous contraband within said facility.

42.    A separate section of the complaint alleges, without indicating a source or witness, that Ms. Gusman did, at NIC, "have in her custody and control, located in the package room of NIC, one (1) publication entitled GQ that was saturated with a liquid substance." It goes on to reiterate C.O. Investigator Dockery's "training and experience" and asserts that she "did perform a preliminary screening test on the aforementioned liquid substances that saturated the above publications, and that based on the foregoing, said liquid substance is alleged and believed to be SYNTHETIC MARIJUANA, a controlled substance." (emphasis in original).

43.    The criminal court complaint was not accompanied by any documentation of the "preliminary screening tests" that C.O. Investigator Dockery claimed to have conducted. The assistant district attorney representing the Bronx D.A.'s office at arraignment was unable to produce any such paperwork when asked, and was indeed unable to specify what sort of test had been conducted. As of this writing, nearly a year later, Ms. Gusman's counsel has still not received any relevant field test reports or other documentation of the "preliminary screening tests" conducted by C.O. Investigator Dockery.

44.    Notwithstanding Ms. Gusman's lack of a criminal record, the lack of any scientific evidence to show that the magazines in question were in fact tainted by a controlled substance, and the nonviolent nature of the allegations, the Bronx District Attorney's office nonetheless asked the court to set bail in the amount of $25,000. Despite defense counsel's vigorous argument for Ms. Gusman's release on her own recognizance, the court ordered that Ms. Gusman held for grand jury action on a bail of $15,000 cash or partially secured bond, and adjourned the case for that purpose until January 9, 2019. It was difficult for defense counsel to

hear the adjourn date because when the bail amount was announced by the judge, Ms. Gusman let out a loud wail of anguish, accompanied by uncontrollable, violent sobbing. Ms. Gusman was led from the courtroom in handcuffs, still bawling, while her family and friends, assembled in the audience for hours, looked on in shock and horror. Ms. Gusman had been ordered to return to Rikers Island, this time not as a visitor but as an inmate.

45.     After considerable difficulty, Ms. Gusman's family was able to gather sufficient funds to post her partially secured bond. Sometime after 4 AM, roughly 32 hours after she had been ordered into the pat frisk room because she bought her parents magazines that had once been wet, Ms. Gusman was finally released from custody.

46.     On January 9, 2019, the Controlled Substance Analysis Section of the New York City Police Department Police Laboratory issued a Laboratory Report concerning the magazines invoiced by C.O. Investigator Dockery. Not only did the report conclude that the magazines contained no controlled substance whatsoever, it found that the magazines "contained no visible residue" of any sort. The report established not only that Ms. Gusman had done nothing illegal, but that there was no apparent basis for anyone to have concluded otherwise. It was not a question of residue that resembled a controlled substance turning out to be something else. Rather, the lab found no residue whatsoever. This raises the very real possibility that the arrest of Ms. Gusman was not a well-intentioned mistake borne out of poor training and incompetence, but was rather the product of malicious motives. The consistent mockery of Ms. Gusman as she asked for information regarding her scheduled visit of her parents and the location of her little brother only reinforces this possibility.

47.     Although the lab report was issued on January 9, 2019, the same day Ms. Gusman appeared for the first time in criminal court following her arraignment, the Bronx

County District Attorney's office did not disclose any information regarding the exculpatory report on January 9, instead requesting that the case be adjourned until March 4, 2019, for possible grand jury action. It was not until more than 2 weeks later that the D.A.'s office reached out to defense counsel to disclose that scientific evidence had proven the charges against Ms. Gusman to be utterly unfounded. The "liquid substance" that had "saturated" the magazines was, as maintained by Ms. Gusman from the beginning, found to be water. Once that information was made public, the case was advanced to January 25, 2019 in Bronx County Criminal Court, where, upon the prosecution's motion, all charges against Ms. Gusman were dismissed and sealed.

48.    Unfortunately for Ms. Gusman, the effects of her unwarranted prosecution continued beyond the date of the case's dismissal. Despite the demonstrably false accusation of promoting prison contraband, the Department of Corrections compounded its error by forbidding Ms. Gusman from visiting either of her parents for a period of six months. Limitations on her visitation privileges continued past the date that her charges were dismissed, and were not fully revoked until counsel intervened and demanded a change from the DOC Legal Department. By the time they had been lifted, Ms. Gusman had been forbidden from seeing her parents for close to two months.

49.    The psychological effects of the Department's false charges have lasted even longer. Ms. Gusman has had difficulty sleeping since the day she was unjustly arrested, plagued by nightmares and anxiety. When she was finally allowed to resume visiting her parents, she approached the Visit Control Center with trepidation, terrified that she would once again be handcuffed and thrown in a cell despite having done nothing wrong. Seeing the same officers who had jailed her and then mocked her plight filled her with terror.

50.     When her parents were incarcerated, Arisbel Gusman rearranged her life to be there for her family. She dropped out of school to provide and care for her little brother, sacrificed what little free time she had left to make twice weekly trips out to Rikers, and braved long commute times and invasive search procedures in an attempt to help the family remain intact during a traumatic and difficult period. The Department of Corrections, which publicly states that it "recognize(s) how important it is for individuals in custody and their families and friends to maintain contact with one another" and that it wants "visits to be pleasant as possible,"[4] made Ms. Gusman's visit a nightmare, all because she had the temerity to bring her parents some reading material. Ms. Gusman was handcuffed, thrown into a cell, repeatedly mocked, and held in custody for more than 32 hours not because she had done anything wrong, but because she had brought some water damaged magazines to Rikers Island. To this date, the Department of Corrections has done nothing to apologize to Ms. Gusman for its outrageous treatment of her. Nor has it changed its training and procedures to ensure that other visitors are not treated with the same callous disregard for the truth. Surely, visitors to Rikers deserve better. Arisbel Gusman certainly did.

### *MONELL* ALLEGATIONS

51.     Ms. Gusman was arrested by Correction Officers at Rikers Island and was accused of smuggling K2 onto Rikers Island simply because she brought her parents magazines to read, magazines that had previously become wet due to rainfall.

52.     There was no probable cause to arrest Ms. Gusman. All criminal charges against her were dismissed on the motion of the prosecution once scientific evidence surfaced establishing her factual innocence of the charges brought against her.

---

[4] Visit Schedule, A Welcome from New York City Department of Correction, https://www1.nyc.gov/site/doc/inmate-info/visit-schedule.page, retrieved 11/29/17.

53.    Despite the dismissal of the charges against her, Ms. Gusman was banned from visiting her parents for a total period of two months, including about a month following her exoneration.

54.    Upon information and belief, the source of which is a review of the papers filed in Camacho, et al v. City of New York, et al, case number 1:19-cv-11096 and related media reports[5], Defendant City of New York and its related entities and employees have a pattern, practice, custom, or policy of the following: 1) Arresting people who bring books or periodicals with them to visit inmates at Rikers Island without probable cause, 2) Falsely charging such people with promoting prison contraband and related offenses, based on an unfounded and unsupported belief that those carrying those books or periodicals are doing so in an effort to smuggle synthetic marijuana, or K2, onto Rikers Island, and 3) Banning those people who bring such books or periodicals from visiting Rikers Island or other New York City Corrections facilities, and maintaining such bans even after the charged individuals have beenexonerated.

55.    As alleged by the plaintiffs in Camacho, Kathy Camacho was visiting Rikers Island on September 2, 2018 when she was falsely arrested for possession of K2, which was alleged to have been contained in a book of crossword puzzles in her possession. Ms. Camacho was released on September 3, 2018 and all charges against her were dismissed on her very next court date, September 15, 2018, as the crossword puzzle book she possessed was shown not to contain any contraband. Defendants were therefore on notice three months before Ms. Gusman's arrest that there was a problem with the detection and testing of K2 in visitor

———————————————

[5] See Graham Rayman, City not book smart over smuggling ban at Rikers Island, New York Daily News, December 4, 2019, https://www.nydailynews.com/new-york/nyc-crime/ny-false-arrests-jail-class-action-lawsuit-20191204-aimpcr2fibcpbpxnykle2gkkza-story.html; Emily Saul, Rikers Island visitors sue NYC over COs' claims that their books were soaked in drugs, New York Post, December 3, 2019, https://nypost.com/2019/12/03/rikers-island-visitors-sue-nyc-over-cos-claims-that-their-books-were-soaked-in-drugs/.

property, which resulted in at least one false arrest and detention, but nonetheless chose to take

no corrective action to prevent others from being similarly falsely arrested. As the Camacho

complaint details, it happened at least four more times AFTER Ms. Gusman's false arrest. In

short, Defendants faced overwhelming evidence that they were systematically falsely arresting

people based on faulty test results, and yet did nothing to change their practices to prevent such

false arrests.


### NOTICE OF DEMAND

56.     On March 28, 2019, within 90 days after the claim alleged in this

Complaint arose, a written notice of claim was served upon Defendants by personal delivery of

the notice.

57.     At least 30 days have elapsed since the service of the notice of claim, and

adjustment or payment of the claim has been neglected or refused.

58.     This action has been commenced within one year and ninety days of the

events upon which it is based.

### FIRST.3
### CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
False Arrest and False Imprisonment
(Against the Individual Defendants)

59.     Plaintiff repeats and alleges the foregoing paragraphs as if the same were

fully set forth at length herein.

60.     By their conduct, as described herein, and acting under color of state law

to deprive Plaintiff of her right to be free from unreasonable searches and seizures, and arrest

without reasonable suspicion or probable cause, as required by the Fourth and Fourteenth

Amendments, Defendants are liable for violations of 42 U.S.C. §1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

61.     Plaintiff was wrongfully and illegally arrested due to Defendant City of New York's unlawful pattern, practice, custom, or policy of arresting persons without probable cause who bring magazines or books with them to Rikers Island.

62.     The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was carried out without any legal basis, without Plaintiff consent, and without probable cause or reasonable suspicion.

63.     Defendant City of New York intended to confine Plaintiff and, in fact, did confine Plaintiff, and Plaintiff was aware of her confinement.

64.     At all relevant times, Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of her liberty, and falsely charged.

65.     At all relevant times, the unlawful, wrongful, and false arrest of Plaintiff was without legal basis, probable cause or reasonable suspicion.

66.     As a direct and proximate result of the misconduct detailed above, Plaintiff suffered emotional distress, loss of liberty damages, and all damages hereinbefore alleged

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Negligent Hiring, Training, Discipline, and Retention of Employment Services
Fourteenth Amendment
(Against Defendants City of New York, NYPD, and DOC)

67.     Plaintiff repeats and alleges the foregoing paragraphs as if the same were set forth at length herein.

68.     The City, NYPD, and DOC owed a duty of care to Plaintiff to prevent the loss of liberty and mental abuse sustained by her. Under the same or similar circumstances, a

reasonable, prudent and careful person should have anticipated that an injury to Ms. Gusman or

an individual in a similar or identical situation would occur as a result of this conduct.

69.     Upon information and belief, the Correction Officer Defendants and

Police Officer Defendants were unfit and incompetent for their positions as correction and police

officers, respectively.

70.     Upon information and belief, the City knew or should have known through

the exercise of reasonable diligence that the Correction Officer and Police Officer Defendants

were incompetent and improperly trained to determine probable cause, or to competently test for

the presence of controlled substances, including the substance K2, and as a result were likely to

arrest civilians without probable cause.

71.     The negligence of Defendants City, NYPD and DOC in hiring and

retaining the Correction and Police Officer Defendants proximately caused Plaintiff injuries as

herein alleged.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Malicious Prosecution
(Defendant City of New York)

72.     Plaintiff repeats and alleges the foregoing paragraphs as if the same were

set forth at length herein.

73.     By their conduct described herein, Defendants are liable to Ms. Gusman

for having committed malicious prosecution in violation of the Fourth and Fourteenth

Amendments to the United States Constitution.

74.     Plaintiff was wrongfully and illegally arrested due to Defendant City of

New York's unlawful pattern, practice, custom, or policy of arresting persons who bring

books or magazines with them to Rikers Island without probable cause and charging them

with crimes related to a false belief that visitors carrying books or magazines onto Rikers

Island are bringing K2 onto Rikers Island.

75.     The City of New York acted maliciously and without justification when

it commenced criminal proceedings against Plaintiff.

76.     All proceedings in criminal court against Plaintiff were terminated in

Plaintiffs' favor.

77.     The Bronx County District Attorney's Office demonstrated malice through

their continued prosecution of Ms. Gusman for weeks after they knew, or should have known,

that scientific evidence had conclusively proven that Ms. Gusman had not committed the crime

they were prosecuting her for, or any other offense.

78.     The malicious prosecution of Ms. Gusman directly and proximately

caused the damages to Ms. Gusman described herein.

### FOURTH CAUSE OF ACTION
Common Law False Arrest and False Imprisonment
(Against all Defendants)

79.     Plaintiff repeats and re-alleges the foregoing paragraphs as if the same

were fully set forth at length therein.

80.     The Defendants wrongfully and illegally arrested Ms. Gusman or failed

to intervene to prevent her wrongful and illegal arrests.

81.     The wrongful, unjustifiable, and unlawful apprehensions, arrest, and

detention of Mr. Gusman were carried out without any basis, without her consent, and

without probable cause or reasonable suspicion.

82.     At all relevant times, the Defendants acted forcibly in apprehending

and arresting Ms. Gusman.

83.     At all relevant times, Ms. Gusman was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of her liberty, and falsely charged.

84.     At all times, the unlawful, wrongful, and false arrest of Ms. Gusman were without basis, probable cause or reasonable suspicion.

85.     The Defendants' misconduct occurred without any fault or provocation on the part of Ms. Gusman.

86.     The Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard for Ms. Gusman's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward her.

87.     Defendant City of New York, as the employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of respondeat superior.

88.     As a direct and proximate result of the misconduct detailed above, Ms. Gusman suffered emotional distress, loss of liberty damages, and all damages hereinbefore alleged.

### **FIFTH CAUSE OF ACTION**
New York Criminal Procedure Law §140.20(1) – Unreasonable Delay in Arraignment
(Against Defendants City, NYPD, DOC, and Bronx County District Attorney's Office)

89.     Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth at length therein.

90.     "Under CPL 140.20(1), a police officer, after performing *without unnecessary delay* the required preliminary police duties, must *without unnecessary delay* bring a person

arrested without a warrant to a local criminal court for arraignment."[6] The Court of Appeals recognized that "the deprivation entailed by pre-arraignment detention is very great with the potential to cause serious and lasting personal and economic harm to the detainee" and thereby upheld a lower court's finding that "a delay of arraignment of more than 24 hours is presumptively unnecessary and, unless explained, constitutes a violation of [State law codified in] CPL 140.20."[7]

91.    Ms. Gusman was detained around 7 PM on January 3, 2019. She was not arraigned in Bronx Criminal Court until 1:15 AM during the early morning hours of January 5, 2019, a period of more than 30 hours, a duration New York courts have deemed "presumptively unnecessary" and, unless explained, a violation of State law.

92.    Upon information and belief, the delay in Ms. Gusman's arraignment was not caused by the particular circumstances of her case, but occurred because she was arrested on Rikers Island, and procedures set in place by defendants City, DOC, NYPD, and the Bronx County District Attorney's Office cause such arrests to take substantially longer to process than arrests anywhere else in New York City.

93.    It is, of course, entirely foreseeable and common that individuals are arrested on Rikers Island. Defendants' failure to adopt procedures that do not unnecessarily delay the arraignment of defendants arrested at this location constitutes deliberate and/or negligent violation of State law obligations to bring such defendants to a local criminal court for arraignment without unnecessary delay.

---

[6] Ex Rel Maxian, 77 N.Y.2d at 424.
[7] Id. at 426-427.

94.     The City, as the municipality that houses defendants NYPD, DOC, and the Bronx County District Attorney's Office, is responsible for their wrongdoing under the doctrine of *respondent superior*.

95.     As a direct and proximate result of Defendants' unlawful conduct, Ms. Gusman suffered the injuries hereinbefore alleged.

## SIXTH CAUSE OF ACTION
Common Law Malicious Prosecution
(Against All Defendants)

96.     Plaintiff repeats and re-alleges the foregoing paragraphs as if the same were fully set forth at length therein.

97.     Acting maliciously and without justification, the Defendants commenced criminal proceedings against Mr. Gusman.

98.     The Defendants commenced these charges falsely, maliciously, in bad faith, and without probable cause.

99.     The Defendants failed to subsequently intervene to prevent the unlawful prosecution of Ms. Gusman.

100.     All criminal charges against Ms. Gusman were terminated in her favor.

101.     Defendants are responsible for the malicious prosecution of Ms. Gusman during this entire period. Defendant City of New York, as the employer of the Individual Defendants, is responsible under the doctrine of respondeat superior.

102.     As a direct and proximate result of the misconduct detailed above, Ms. Gusman suffered emotional distress, loss of liberty damages, and all damages hereinbefore alleged.

*       *       *

## **DAMAGES**

103.     As a direct and proximate result of the acts of Defendants, Plaintiff

suffered the following injuries and damages:

a.   Violation of her enumerated rights, detailed above, under the United States

and New York State Constitutions.

b.   Emotional trauma and suffering, including fear, embarrassment, humiliation,

emotional distress, frustration, extreme inconvenience, anxiety, depression,

and insomnia.

c.   Lost wages.

d.   Loss of liberty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as

follows:

i.   A judgment declaring that the Defendants have committed the violations

of law alleged in this action;

b.   Compensatory damages in an amount to be determined at trial;

i.   Punitive damages against the non-municipal Defendants in an amount to

be determined at trial;

ii.   A declaration that the City's policy or custom of delaying the arraignment

of defendants past 24 hours because they are arrested on Rikers Island is a

violation of State Law;

c.      An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements of this action, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

d.      Such other and further relief as this Court may deem just and proper.

Dated:  New York, New York

December 19, 2019

By: _____/s/_____


_____/s/_____

LAW OFFICES OF GOLDMAN & ASSOCIATES

By:     Steven Goldman
        Peter A. Barta
        190 East 161st Street, Suite 100
        Bronx, New York 10451
        (718) 538-5743

*Attorneys for Plaintiffs*